617 S.E.2d 431

**Tyrone Alphonso WILSON**

v.

**COMMONWEALTH of Virginia.**

**Record No. 1229–03–1.**

Court of Appeals of Virginia,
Richmond.

Aug. 23, 2005.

Kelsey, J., concurred in an opinion joined by Bumgardner and McClanahan, JJ.

Clements, J., concurred in part and dissented in part.

Benton, J., dissented in an opinion joined in part by Fitzpatrick, C.J., and Clements and Elder, JJ.

Frank, J., concurred in part and dissented in part in an opinion joined by Elder, J.

410

Allan D. Zaleski (Weisberg & Zaleski, P.C., on brief), Norfolk, for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General (Judith Williams Jagdmann, Attorney General, on briefs), for appellee.

Present: FITZPATRICK, C.J., and BENTON, ELDER, BUMGARDNER, FRANK, HUMPHREYS, CLEMENTS, FELTON, KELSEY, McCLANAHAN and HALEY, JJ.

## UPON REHEARING EN BANC

HUMPHREYS, Judge.

This matter comes before the Court on a rehearing *en banc* from a divided panel opinion issued January 18, 2005. Tyrone Alphonso Wilson ("Wilson") appeals his bench trial convictions for possession of cocaine with the intent to distribute, possession of marijuana with the intent to distribute, possession of a firearm while in possession of a controlled substance, and possession of a firearm by a convicted felon. Wilson raises three assignments of error, specifically: (1) the court improperly refused to consider an alleged "plea agreement," (2) the trial judge improperly refused to recuse himself, and (3) the evidence was insufficient to support his convictions. For the reasons that follow, we affirm his convictions.[1]

## I. BACKGROUND

In accord with settled principles of appellate review, we view the evidence in the light most favorable to the Commonwealth, the party prevailing below. *Banks v. Commonwealth*, 41 Va.App. 539, 543, 586 S.E.2d 876, 877 (2003). So viewed, the evidence in this case establishes the following.

---

1. Judge Clements joins only in Part III(C) of the majority opinion relating to the sufficiency of the evidence and would remand for a new trial based upon the analysis contained in that portion of Judge Benton's dissent with regard to the remaining issues relating to the plea agreement and the failure of the trial judge to recuse himself.

At approximately 8:45 p.m. on December 5, 2001, several officers and investigators from the Norfolk City Police Department executed a search warrant at an apartment leased to a "Deshawn Melton." [2] After breaking a side window as a diversionary tactic, the officers entered the residence through the front door. The officers proceeded through the living room of the apartment into the kitchen, where they discovered six individuals, including Wilson. Officer Poch then "gave a command for everybody to lay on the floor," and, "[w]ithin a matter of seconds of each other everybody went to the floor." Wilson "lay [ ] flat on the kitchen floor to the right of the refrigerator."

Officer Gardner then "commanded [Wilson] to show [ ] his hands." Wilson "put them straight out in front of him outstretched," and, after Officer Gardner "told [Wilson] not to move," Wilson said, "I have a gun." When asked where the gun was located, Wilson said it was "underneath" him. Officer Barber then recovered a fully-loaded "Ruger auto pistol" from Wilson's "left hip, upper thigh area."

Officer Payne handcuffed Wilson and escorted him outside. Officer Payne then asked Wilson "if he had any weapons or narcotics on him." Wilson responded, "No." Officer Paine asked for consent to search his person, and Wilson agreed. Officer Paine found a holster in Wilson's waistband and a "large sum of money," totaling $1,755, in his pocket. The officers also found a set of keys in Wilson's pocket.

Officer Edwards conducted surveillance on the apartment for one hour and twenty-five minutes before the warrant was executed. Between 7:20 p.m. and 8:10 p.m., Officer Edwards saw multiple individuals approach the apartment and gain entry. Although a few of the individuals left the apartment during that time frame, Officer Edwards saw four individuals "going into the apartment who did not come out." He did not

---

**2.** The officers later discovered that "Deshawn" was actually Michael Wilson, one of the individuals found inside the apartment during the search.

see anyone enter or leave the apartment between 8:10 p.m. and 8:45 p.m., when the warrant was executed.

Also, before the officers entered the apartment, Officer Decker approached a window that he had been "assigned to break out" as a diversionary tactic. While looking through the window, Officer Decker saw three people sitting on a couch in the living room. On the floor to the right of the couch, Officer Decker observed "a baggie with a white substance probably about the size of maybe a hard ball." About three to three and a half feet away, Officer Decker also saw "the handle of a gun" protruding from underneath the sofa.

After the suspects had been removed from the apartment, Officer Barber, the lead investigator, began searching the interior of the residence. Officer Barber found "a bag of what [he] suspected to be cocaine" on the floor of the living room. Laboratory testing confirmed that the bag contained 47.86 grams of cocaine. About "three or four feet" away from the bag, he found "a nine-millimeter pistol fully loaded, locked and loaded with ammunition." No fingerprints were recovered from the weapon. Officer Barber also found "a wallet, a set of keys, a small amount of marijuana, [a] cell phone, and a pager" on one of the sofas in the room.

After searching the living room, Officer Barber moved into the kitchen. In a cabinet over the stove, Officer Barber discovered "six baggies, clear cellophane baggies with smaller baggies of marijuana in each baggie with cash, U.S. currency in each bag." The other kitchen cabinets contained "small, very small, very tiny packages, different color baggies, some green baggies, some clear baggies[,] . . . [and] sandwich baggies with the corners cut off." Officer Barber found a loaded revolver in one of the kitchen drawers. No fingerprints were recovered from the weapon. Officer Barber also discovered "scales with what appeared to be cocaine residue on the scales[,] . . . a pager, . . . and several cell phone plastic holders." Additionally, on a shelf above the refrigerator, Officer Barber found a television monitor and video camera

that he believed were used to conduct surveillance on the property.

Officer Barber then searched the front bedroom. Inside the bedroom closet, Officer Barber found "a large green-type trash bag" containing seven bales of "green material." Although the "green material" was not marijuana, Officer Barber testified that the material "appeared" to be "fake counterfeit," reasoning that "[t]his material was packaged up exactly like [he] had seen packaged marijuana before in brick-like bags," concluding that "it appears they were going to try to sell it as rip-off." Inside the other bedroom, Officer Barber also found a "SS magazine with four rounds in it."

Overall, the apartment was sparsely furnished, there were no clothes in either bedroom, no personal effects in the bathroom, and no food or cooking implements in the kitchen. Although Officer Barber found a cast iron skillet in the kitchen, he explained that one of the ways to convert powdered cocaine into crack cocaine "is to actually cook the cocaine up with a cursor" inside a cast iron skillet, "[l]et it cool[,] . . . chip it off, [and] then bag it."

While the other officers were searching the interior of the apartment, Officer Joseph, a dog handler in the narcotics division, screened the vehicles outside of the apartment complex. Officer Joseph's dog alerted on a "late model silver Cadillac," which was found to have narcotics in the center console. The dog then alerted on a "2000 GMC Denali." A search of that vehicle yielded "a quantity of United States currency in the black jacket that was in the rear of the SUV," as well as a "quantity of marijuana [that] was also in the rear passenger seat." The dog next alerted on a "burgundy van," after running to the van "without any direction" from Officer Joseph. The officer placed the dog inside of the van, and, "[o]nce inside the vehicle," the dog "went to the side panel door on the passenger side and began scratching frantically." Officer Joseph then "took a crow bar and pried [the panel] open." Officer Joseph found a "package of white powder"

inside the panel. The officers then decided that "a more detailed examination" of the van was needed.

After moving the van to the police operations center and "taking it apart," Officer Barber found additional cocaine packages in one of the "traps" that had been installed in the doors. The officers discovered that, to operate the trap doors, if "[y]ou take the plastic off of the door handle and put the positive and negative [poles from a battery] to those door handle[s]," the electric current "would open the trap up." To close the trap door, "[y]ou reverse the polarity." The officers found the battery used to open the trap doors "in the rear of the van." The packages of cocaine found inside the van, which had different but relatively high levels of purity, totaled approximately 2.8 kilograms and had a street value of approximately $350,000.

Although the van was not titled in Wilson's name, one of the keys recovered from Wilson's pocket "belonged to the van." On the evening in question, none of the other five individuals discovered inside the apartment possessed a key to the van. Inside the van, Officer Barber also found a "gun magazine" for a "Ruger .45 caliber" pistol—the same type of pistol that was found on Wilson's person. The Ruger .45 caliber pistol found on Wilson's person was the only gun of that type discovered in the apartment.

Wilson was arrested and charged with two counts of possession of a firearm while in possession of cocaine, in violation of Code § 18.2–308.4, possession of cocaine with intent to distribute, in violation of Code § 18.2–248, possession of marijuana with intent to distribute, in violation of Code § 18.2–248.1, and possession of a weapon by a convicted felon, in violation of Code § 18.2–308.2.

## II. PROCEDURAL HISTORY

Wilson's case was initially set for trial on July 16, 2002. Although the case was originally scheduled to be heard by Judge Charles E. Poston, Judge Poston was unable to hear the case on the scheduled date due to a medical appointment.

Accordingly, Wilson's case was transferred to the hearing docket of Judge Charles D. Griffith, Jr. Although Wilson had previously and repeatedly told the Commonwealth that he wanted a bench trial, Wilson pled not guilty and requested a jury trial. When questioned by Judge Griffith about the request, Wilson's counsel, Allan Zaleski, explained that Wilson decided he wanted a jury trial "when the matter was transferred" to Judge Griffith. Zaleski admitted that, "whenever a lawyer counsels with his client about whether it's appropriate to try a matter with a judge or a jury, it's important to know who the judge is" and that he "cannot intelligently decide [whether to request trial by judge or jury without] know[ing] who the judge is." Judge Griffith granted Wilson's request for a jury trial, continued the case, and, concluding Zaleski was "judge shopping," announced he would remove Zaleski from the court-appointed counsel list.

On July 25, 2002, Judge Marc Jacobson, at the time the Chief Judge of the circuit, heard Wilson's motion to suppress. Judge Jacobson denied the motion in an August 29, 2002 opinion letter.

On September 6, 2002, Judge Everett A. Martin, Jr., arraigned Wilson. At that point, Zaleski announced that Wilson no longer wished to have a jury trial. Judge Martin expressed "concerns" about "awarding his judge shopping," but set the case for a bench trial on September 10, 2002. Zaleski acknowledged to Judge Martin that Wilson understood "this case c[ould] go to anyone."

On September 10, Wilson appeared for the scheduled trial, over which Judge Griffith was again presiding. When the case was called, Zaleski told Judge Griffith that "we're very close to a plea agreement in this case." Judge Griffith responded that the trial was ready to proceed. The Commonwealth's attorney announced that she was ready to proceed, and Zaleski acknowledged that the defense was also ready. Thereafter, the following exchange took place:

> [COMMONWEALTH'S ATTORNEY]: Before the court proceeds in this case further, it's my understanding that

[Wilson] would like to enter a plea of guilty. *We don't have a plea agreement written out.* We would ask the court to accept the plea. It calls for a total sentence of twenty years with four to serve.

THE COURT: I'm sorry, but we're getting ready to start a trial. You-all have had plenty of time to negotiate. We're not doing any negotiations right now. We're starting a trial.

MR. ZALESKI: You're rejecting the agreement? I would move—

THE COURT: There is no agreement. This case is beginning trial. You are beyond your time to negotiate a plea agreement. We're starting a trial today.

(Emphasis added). The Commonwealth then explained, "[O]nce the court hears what this is, I think Your Honor will understand why there's these last minute plea negotiations." Judge Griffith conducted a brief hearing in chambers during which the Commonwealth expressed its reasons for offering the plea agreement.[3] Afterwards, Judge Griffith stated, "You seem to think . . . that somehow or another you have a right to stop everything and present a plea agreement and force me to consider a plea agreement. This trial is ready to begin. Your time for negotiating is over. It's time to start the trial." The following exchange then occurred:

MR. ZALESKI: Is the court saying you will not consider any plea agreement at this time?

THE COURT: You have no plea agreement.

MR. ZALESKI: That is the court's position?

THE COURT: We have started a trial. It's too late to negotiate.

MR. ZALESKI: You are stating you will not consider any plea agreement at all?

---

**3.** A prospective witness for the prosecution had apparently given false testimony in an earlier federal proceeding. The Commonwealth decided to offer Wilson a plea agreement to avoid the "potential problems with [the witness]" that might arise during a trial on the merits.

THE COURT: I'm not going to interrupt this trial and submit a plea agreement. That's correct. We are ready to start the trial.

MR. ZALESKI: Your Honor, we're going to have a lunch break. We're going to have—we're going to have certainly a break to go to the bathroom.

THE COURT: Are you suggesting, Mr. Zaleski, that once a trial begins that the court has to consider a plea agreement?

MR. ZALESKI: Yes, Your Honor. I can get the rules out. Let's look at it.

THE COURT: You're saying you can stop any trial and force the court to undertake a plea agreement if the court rejects it thereby obviating your entire trial? I think you are wrong about that. And we'll just have to let you challenge that. Let's go.

After the witnesses were sworn, Zaleski then moved for Judge Griffith to recuse himself from the case, arguing that the judge was biased against his client. Judge Griffith denied Zaleski's motion, explaining that, after Judge Martin granted the request for a bench trial, Judge Griffith

approached . . . the chief judge of the court and explained to him what had occurred and that [Judge Griffith] felt it was appropriate that since the defendant had decided that he no longer wished a jury trial but that had initially asked for a jury trial and on advice of counsel specifically to avoid one of the members of this court, that the one thing it wasn't appropriate is for the defendant to avoid a particular court-room solely by asking for a jury trial.

Judge Griffith further announced he was willing and able to impartially hear Wilson's case, noting that he did not "hold any ill will" towards Zaleski even though he did not approve of Zaleski's pre-trial conduct. Judge Griffith concluded that he was "as capable as anyone else is at giving [Wilson] a fair trial," assuring Wilson "that the Commonwealth is going to have sufficient evidence before [he would] make any determination that's adverse to him."

Following a trial on the merits, the court found Wilson guilty on all charges and sentenced him to five years on the charge of possession of a firearm by a convicted felon, five years on the charge of possession of a firearm while in possession of illegal narcotics,[4] ten years on the charge of possession of marijuana with intent to distribute, with all ten years suspended, and forty years on the charge of possession of cocaine with intent to distribute, with twenty years suspended, resulting in a total sentence of sixty years in prison, with thirty years suspended. While sentencing Wilson to forty years on the count of possession of cocaine with intent to distribute, the trial court noted that Wilson was "thoroughly embroiled in this major distribution of cocaine," and "[r]arely do individuals at this level get caught like this." Although acknowledging that, by imposing the maximum statutory sentence, he was sentencing Wilson above the sentencing guidelines, the trial court reasoned that "the departure from the guidelines in this case is reasonable" because Wilson is "a major leaguer of a major drug organization," and "[t]hat's not adequately reflected or considered by the guidelines."

Wilson appealed, and, by memorandum opinion issued January 18, 2005, a divided panel of this Court reversed and remanded his convictions. By order entered March 1, 2005, this Court granted the Commonwealth's petition for rehearing *en banc* and stayed the mandate of the panel opinion. Upon rehearing this matter *en banc,* we now affirm.

## III. ANALYSIS

On appeal, Wilson argues that the trial judge erroneously: (1) refused to consider his "plea agreement," (2) refused to recuse himself; and (3) found the evidence sufficient to support his convictions. Because the trial judge did not abuse his discretion by refusing to halt the trial to permit submission of the "plea agreement," did not abuse his discretion by refusing to recuse himself, and did not clearly err in finding the

---

4. The trial court dismissed on double jeopardy grounds a second conviction for possession of a firearm while in possession of cocaine.

evidence sufficient to support Wilson's convictions, we affirm the judgment of the trial court.

### A. The "Plea Agreement"

Wilson contends that the trial court erred in refusing to consider his last-minute "plea agreement." Because, under the circumstances of this case, the parties failed to properly present the alleged "agreement" to the court, we affirm.

According to Rule 3A:8(c), "[t]he attorney for the Commonwealth and the attorney for the defendant . . . may engage in discussions with a view toward reaching a[ ] [plea] agreement." And, according to Rule 3A:8(c)(2),

*If a plea agreement has been reached by the parties, it* ***shall, in every felony case, be reduced to writing,*** *signed by the attorney for the Commonwealth, the defendant, and, in every case, his attorney, if any, and presented to the court.* The court shall require the disclosure of the agreement in open court or, upon a showing of good cause, in camera, at the time the plea is offered. If the agreement is of the type specified in subdivision (c)(1)(A) or (C), the court may accept or reject the agreement, or may defer its decision as to the acceptance or rejection until there has been an opportunity to consider a presentence report. . . .

(Emphases added). Also, Rule 3A:8(c)(4) provides that, "if the court rejects the plea agreement," then the court must "advise the defendant that, if he chooses to withdraw his plea of guilty or of *nolo contendere,* his case will be heard by another judge, unless the parties agree otherwise." The purpose of Rule 3A:8(c), which is procedural rather than substantive in nature, "is to ensure that plea agreements are fully disclosed to both the trial court and the defendant." *Hairston v. Commonwealth,* 16 Va.App. 941, 945, 434 S.E.2d 350, 353 (1993).

Thus, before the trial court "may accept or reject" a plea agreement in a felony case, that agreement must be: "[1] reduced to writing, [2] signed by the attorney for the Commonwealth, the defendant, and . . . his attorney, . . . and [3] presented to the court." Rule 3A:8(c)(2); *see also Wolfe v.*

*Commonwealth,* 1 Va.App. 498, 499, 339 S.E.2d 913, 914 (1986) ("This rule [ ] requires that a plea agreement be reduced to writing, signed by the attorney for the Commonwealth, the defendant and his attorney, and presented in open court."). Application of Rule 3A:8(c), however, presupposes the existence of an actual agreement between the parties. *See* Rule 3A:8(c)(2) ("*If* a plea agreement has been reached by the parties, it shall . . . be . . . presented to the court." (emphasis added)).

■ Under the circumstances of this case, it is not clear whether the parties actually reached an oral plea agreement, or if the parties merely made an "agreement to agree." Zaleski informed the trial court that the parties were "very close to a plea agreement." That statement implies that the parties had not yet had the requisite meeting of the minds needed to constitute an agreement. However, the prosecutor informed the trial court that the parties had an agreement that "calls for a total sentence of twenty years with four to serve." This statement implies that the parties had reached an agreement, with sufficient certainty of terms, but had not yet had time to reduce the agreement to writing. Moreover, although the trial court stated that the parties "have no plea agreement," it is not clear whether this constitutes a finding of fact (that the parties had not yet reached an agreement) or a conclusion of law (that, although the parties may have reached an agreement, the agreement was not binding because they had not presented it to the court and the court had not accepted it). *See Lampkins v. Commonwealth,* 44 Va.App. 709, 721, 607 S.E.2d 722, 728 (2005) (noting that a "plea agreement, by statute" is "not a binding contract" if "the court had not yet accepted it").

To the extent that the trial court made a factual determination that the parties had not yet entered into an agreement, that finding is binding on appeal unless plainly wrong or without evidence to support it. *See Hood v. Commonwealth,* 269 Va. 176, 180, 608 S.E.2d 913, 916 (2005) ("[T]he trial court's interpretation of the [plea] agreement is a matter of

law subject to *de novo* review, while a clearly erroneous standard of review is applied to the trial court's factual findings."). Here, the trial court could conceivably have reconciled the attorneys' statements and found that the parties had not yet entered into an actual agreement for lack of an offer, acceptance, or sufficient certainty of terms. *See id.* at 180, 608 S.E.2d at 916 (noting that plea agreements "are generally governed by the law of contracts"); *see also Naulty v. Commonwealth*, 2 Va.App. 523, 527, 346 S.E.2d 540, 542 (1986) (affirming trial court's finding that "no plea agreement had ever been reached" where the evidence established that the defendant rejected the Commonwealth's offer and then later tried to accept it). Thus, if the trial court did, in fact, find that the parties failed to establish that they had entered into an agreement, that factual finding is not plainly wrong or without evidence to support it.

■ Similarly, to the extent that the trial court made a legal ruling that it need not consider the agreement because that agreement was not properly presented to the court, we agree that the parties failed to comply with the provisions of Rule 3A:8(c). First, the parties unquestionably failed to reduce the terms of the agreement to writing.[5] Second, the parties did not present any document that had been signed by

---

5. *Cf. United States v. Pierre*, 120 F.3d 1153, 1155 (11th Cir.1997) (holding that the defendant entered an unconditional rather than conditional guilty plea under Fed.R.Crim.P. 11 because "the plea was not preserved in writing, as required by Rule 11(a)(2)," reasoning that the requirement that the agreement be in writing was intended to ensure that the government had given its express consent to the terms of the conditional plea); *United States v. Fischetti*, 475 F.Supp. 1145, 1151 (D.N.J.1979) (where "both the government and the defendants insist that they have an agreement and wish to have it recognized," but the plea agreement had not been placed in writing, the court informed the parties that it would only consider written plea agreements, noting the "importance of employing routine requirements of signed memoranda as a simple and obvious tool to provide certainty and avoid controversy," and further reasoning that "[i]mportant transactions such as property contracts, deeds, mortgages and wills have long been required to be put in writing," and that "[a]greements in respect to pleas affecting a person's constitutional rights and liberty are hardly of lesser importance").

the Commonwealth, the defendant, and the defendant's attorney. Third, the complete terms of the agreement were not disclosed to the court. Although the prosecutor informed the trial court that the agreement "calls for a total sentence of twenty years with four to serve," the parties did not proffer any of the other necessary specifics of a proper plea agreement. For example, the parties did not disclose whether Wilson was pleading guilty to all or some of the charges, to one or more lesser or reduced offenses, whether he was entering a plea of guilty or *nolo contendere,* or whether other charges would be dismissed, reduced, or simply not pursued.[6] This information is of crucial importance because, for example, a trial court has the right to refuse a plea of guilty to a lesser-included offense, but is required to accept a plea of *nolo contendere* to the offense charged. *See* Code § 19.2–254 ("The court may refuse to accept a plea of guilty to any lesser offense included in the charge upon which the accused is arraigned, but ... the court shall not refuse to accept a plea of *nolo contendere.*"); *see also Graham v. Commonwealth,* 11 Va.App. 133, 137, 397 S.E.2d 270, 272 (1990) ("The only discretion given to a court by the statute is the right to refuse a plea of guilty to any lesser offense included in the charge upon which the accused is arraigned."). Accordingly, forcing the court to halt the trial in order to consider an orally proffered agreement as nebulous as the one at issue here would undermine the clear purpose of Rule 3A:8(c): "to ensure that plea agreements are *fully* disclosed to both the

---

**6.** Although the record does not fully disclose the terms of the "plea agreement," the Commonwealth noted, in a post-trial brief filed in the trial court, that "[t]his plea agreement called for the Commonwealth to nolle pross [sic] some of the charges in exchange for the defendant's guilty plea to some of the other charges." However, the parties did not disclose even this detail to the trial court when Zaleski first asked the court to halt the trial in order to permit finalization of the plea negotiations. Moreover, at oral argument before this Court *en banc,* when asked whether the "plea agreement" called for charges to be dropped, Zaleski responded "I presume so." Other questions regarding the specific terms of the "plea agreement" were answered with similar imprecision.

trial court and the defendant." *Hairston,* 16 Va.App. at 945, 434 S.E.2d at 353 (emphasis added).

Because, even assuming an oral plea agreement existed, the parties did not reduce that agreement to writing, did not sign the agreement, and did not disclose the complete terms of the agreement to the court; the parties failed to properly present the plea agreement to the court pursuant to Rule 3A:8(c). *Cf. Commonwealth v. Sandy,* 257 Va. 87, 91, 509 S.E.2d 492, 493–94 (1999) (holding that this Court "erred in concluding that the defendant and the Commonwealth's Attorney entered into a plea agreement in accordance with Rule 3A:8(c)(1)(C)(2)" because "the agreement in this case was never approved by the circuit court as required by Rule 3A:8"). And, because the parties did not properly submit the plea agreement to the trial court for consideration, the court was not required to "accept or reject" the terms of that agreement.[7]

 Because the provisions of Rule 3A:8 are not implicated, we review the trial court's decision to deny the "motion" made by Zaleski to halt the proceedings under an abuse of discretion standard. *See Graham,* 11 Va.App. at 141, 397 S.E.2d at 274. Here, although six months had elapsed between Wilson's last indictment and the morning of his trial on the merits, Zaleski merely advised the court that the parties were "very close" to a last-minute plea agreement. Even

---

7. The parties have not addressed, and we therefore do not decide, whether the trial court is required to consider a plea agreement that has been properly reduced to writing, signed, and presented to the court pursuant to Rule 3A:8 after trial has commenced. *But cf. United States v. Stamey,* 569 F.2d 805, 806 (4th Cir.1978) (holding that the trial court did not err when it accepted the defendant's guilty plea without first considering the substance of a proffered plea agreement, reasoning that the federal rules "permit[ ] each federal court to decide for itself the extent to which it will permit plea negotiations," and concluding that "[n]o court is compelled to permit any plea negotiations at all" (internal quotations omitted)); *see also United States v. Petty,* 600 F.2d 713, 713 (8th Cir.1979) ("[A] district court is under no duty to consider a negotiated plea agreement."); *In re Yielding,* 599 F.2d 251, 252–53 (8th Cir.1979) (denying writ of mandamus where petitioner sought to compel the district court to consider a negotiated plea agreement, reasoning that "the district court was under no duty to [do so]").

elevating this statement to the status of a motion to suspend the proceedings pending further negotiations between the parties, "as a general proposition, a trial court is given discretion in deciding whether to grant an untimely motion, taking into consideration whether the motion was designed to impede the efficient administration of criminal justice." *Id.* In light of the multiple, prior continuances in the case and the fact that the parties had ample time to enter into and finalize plea negotiations prior to the trial on the merits, we hold that the trial court did not abuse its discretion when it refused to stop the trial for the purpose of entertaining the defendant's last-minute motion for consideration of an unwritten plea agreement.[8]

### B. *The Judge's Failure to Recuse Himself*

Second, Wilson contends that the trial judge abused his discretion by failing to recuse himself, reasoning that "the record does show some things which taken together indicate a

---

8. Unquestionably, a defendant has the right, under Article I, section 8 of the Virginia Constitution, to plead guilty to the whole of an indictment. *See Graham,* 11 Va.App. at 139, 397 S.E.2d at 273. Also, "[t]he fact that the trial has begun has no effect on a defendant's constitutional right to plead guilty." *Id.* at 141, 397 S.E.2d at 274. Thus, "[t]he fact that a plea is tendered mid trial is irrelevant to the analysis regarding a defendant's right to enter a plea of guilty," *id.,* and "a defendant may [therefore] plead guilty at any time prior to the return of the jury's verdict concluding the guilt phase of a bifurcated trial." *Daye v. Commonwealth,* 21 Va.App. 688, 692, 467 S.E.2d 287, 289 (1996). However, at no point prior to the verdicts did Wilson actually change his "not guilty" plea to a "guilty" plea, and the trial court's decision to disregard the orally proffered "agreement" did not preclude Wilson from pleading guilty: it merely prevented him from doing so in accordance with the terms of the agreement he had presumably reached with the Commonwealth's attorney. Accordingly, Wilson's constitutional right to plead guilty was neither implicated nor violated under the circumstances of this case. *See United States v. Hyde,* 520 U.S. 670, 677, 117 S.Ct. 1630, 1634, 137 L.Ed.2d 935 (1997) (holding that the Ninth Circuit erred when it "equated acceptance of the guilty plea with acceptance of the plea agreement, and deferral of the plea agreement with deferral of the guilty plea," explaining that a guilty plea and a plea agreement are only " 'bound up together' in the sense that a rejection of the agreement simultaneously frees the defendant from his *commitment* to plead guilty" (emphasis added)).

perception that the Judge's impartiality may be reasonably questioned." We hold that, because Wilson has failed to demonstrate actual bias or prejudice, the judge did not abuse his discretion by failing to recuse himself.[9]

According to Canon 3(A) of the Canons of Judicial Conduct, "[a] judge shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." And, as noted in *Davis v. Commonwealth,* 21 Va.App. 587, 466 S.E.2d 741 (1996),

> The requirement of this Canon is clear; a judge must diligently avoid not only impropriety but a reasonable appearance of impropriety as well. Exactly when a judge's impartiality might reasonably be called into question is a determination to be made by that judge in the exercise of his or her sound discretion.

*Id.* at 591, 466 S.E.2d at 743.

■ However, as noted in *Commonwealth v. Jackson,* 267 Va. 226, 590 S.E.2d 518 (2004), "[w]hile the Canons may be helpful, the case law of the Commonwealth alone determines whether failure to recuse warrants reversal of a judgment." *Id.* at 229, 590 S.E.2d at 519. Thus, "[a] purported violation of the Canons alone is not enough to mandate recusal." *Id.* Rather, the party moving for recusal "has the burden of proving the judge's bias or prejudice." *Id.* at 229, 590 S.E.2d at 519–20. And, "[i]n the absence of proof of actual bias, recusal is properly within the discretion of the trial judge." *Id.* at 229, 590 S.E.2d at 520.

---

**9.** Although Zaleski made the motion for recusal after Judge Griffith declined to consider the plea agreement, he did not argue that the judge should recuse himself according to the provisions of Rule 3A:8(c)(4), which provides that a judge should recuse himself from a case if he rejects a proffered plea agreement. Rather, Zaleski argued only that Judge Griffith was prejudiced against both Wilson and his counsel, reasoning that "the remarks that the Court made about [Zaleski's] performance" and the fact that Judge Griffith had sought out the case indicated that the judge "certainly [was] biased . . . as to this particular case." Regardless, because Judge Griffith did not consider the plea agreement—much less reject that agreement—the provisions of Rule 3A:8(c)(4) are not implicated under the circumstances of this case.

■ Under the circumstances of this case, Wilson failed to demonstrate that Judge Griffith treated him "in a biased or prejudicial manner." *Id.* at 230, 590 S.E.2d at 520. Although the evidence does support an inference that Judge Griffith was upset and irritated with Zaleski, we note that the judge's alleged bias or prejudice must be directed toward the defendant—not the defendant's attorney. *See id.* ("[T]here is no evidence that Judge Griffith treated *[appellant]* in a biased or prejudicial manner at the revocation hearing." (emphasis added)).

■ Here, although Judge Griffith expressed his displeasure at Zaleski's pre-trial conduct, he assured Wilson on the record "that the Commonwealth is going to have sufficient evidence before [he would] make any determination that's adverse to him." At the post-trial hearing on Zaleski's motion to reconsider, Judge Griffith further stated that, "I don't know Mr. Wilson. I don't have any feelings about Mr. Wilson. It makes no difference to me who Mr. Wilson is any more than any other person who comes in this courtroom and it wouldn't matter to him as far as the law is concerned. . . ." The record of the trial does not demonstrate that the trial judge acted in a biased or prejudicial manner toward Wilson during his trial. And, although Judge Griffith had presided over a prior stage of Wilson's trial, "[t]he fact that a trial judge is 'familiar with a party and his legal difficulties through prior judicial hearings . . . does not automatically or inferentially raise the issue of bias.'" *Motley v. Virginia State Bar,* 260 Va. 251, 262, 536 S.E.2d 101, 106 (2000) (quoting *Deahl v. Winchester Dep't of Soc. Servs.,* 224 Va. 664, 672–73, 299 S.E.2d 863, 867 (1983)) (internal quotations omitted). Thus, nothing in the record suggests that Judge Griffith was biased against Wilson.

Wilson, however, contends that Judge Griffith's failure to recuse himself resulted in actual prejudice, reasoning that he received an excessive sentence. Although Wilson's sentence exceeded that suggested by the sentencing guidelines, we note that the guidelines are permissive rather than mandatory. *See Jett v. Commonwealth,* 34 Va.App. 252, 256, 540 S.E.2d

511, 513 (2001) (noting that the sentencing guidelines "are merely a tool intended to assist the court in fixing an appropriate sentence"). Regardless, Judge Griffith explained the imposition of Wilson's relatively harsh sentence, attributing the sentence not to his own animosity toward Wilson or his attorney, but rather, the unusual circumstances of the case, specifically, that the evidence showed Wilson to be "a major leaguer of a major drug organization," and "[t]hat's not adequately reflected or considered by the guidelines." Because the forty-year sentence was within the statutory maximum imposed by Code § 18.2–248, the imposition of the maximum sentence alone is insufficient to demonstrate actual prejudice to the defendant. *See Abdo v. Commonwealth,* 218 Va. 473, 479, 237 S.E.2d 900, 903 (1977) ("[W]hen a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion."); *cf. Stamper v. Commonwealth,* 228 Va. 707, 714, 324 S.E.2d 682, 686 (1985) ("The defendant's motion points to several adverse rulings at trial as indications that the judge was prejudiced against him. But if this were the criterion of prejudice, no rulings could ever be made which a party opposes."); *Welsh v. Commonwealth,* 14 Va.App. 300, 317, 416 S.E.2d 451, 459–60 (1992) ("[U]nless the conduct of the judge is shown to have affected the outcome of the case, the conviction will not be reversed, even though the judge may have infringed an ethical duty imposed by Canons of Judicial Conduct.").

■■■ Because Wilson did not prove actual bias or prejudice, the decision to grant or deny the motion for a recusal was vested in the discretion of the trial court. *Jackson,* 267 Va. at 229, 590 S.E.2d at 520; *see also Motley,* 260 Va. at 262, 536 S.E.2d at 106 ("Whether a trial judge should recuse himself or herself involves the exercise of discretion."). "In exercising his discretion in this regard, the judge must be guided not only by the true state of his impartiality, but also by the public perception of his fairness, in order that public confidence in the integrity of the judiciary may be maintained." *Stamper,* 228 Va. at 714, 324 S.E.2d at 686; *see also Justus v. Common-*

*wealth,* 222 Va. 667, 673, 283 S.E.2d 905, 908 (1981) ("A trial judge must exercise reasonable discretion to determine whether he possesses such bias or prejudice as would deny the defendant a fair trial.").

▮ Here, while we agree that Judge Griffith's pre-trial conduct—particularly his apparent solicitation of the case—may arguably suggest an appearance of impropriety, the record is clear that the ultimate decision to reassign the case to Judge Griffith was made by several judges of the Norfolk Circuit Court, including its Chief Judge, acting collectively, rather than by Judge Griffith individually. Specifically, during the post-trial hearing on Wilson's motion to reconsider, Judge Griffith noted that, after Judge Martin told him that Wilson had waived his right to a jury trial after arraignment,

> *we* also agreed that it might be appropriate to address the matter with the chief judge of our court . . . and explained to him the history and let him take the appropriate action. And the appropriate action that *he* determined was, well, if this whole thing was somehow designed as it appeared to be by Mr. Zaleski to simply avoid trial in a particular court-room in this building, that could not be condoned and would not be condoned; so the case was assigned to me. That's the sole purpose. That's the reason *we* did it.

(Emphases added). The entirely valid concern of these judges, collectively, was to "prevent lawyers [from] attempting to manipulate [their] rules and procedures." By reassigning the case, then, the court was taking steps to maintain—not undermine—the integrity of the judiciary. And, considering the circumstances of this case, we cannot say that this concern was ill-founded.

Moreover, given the circumstances of this case, it is not clear that the general public would view the collective action of the Norfolk Circuit Court as evidencing bias or prejudice toward Wilson. Absent a demonstrated public perception of bias, Wilson's belief that Judge Griffith acted improperly is insufficient to mandate recusal. *See Scott v. Rutherfoord,* 30 Va.App. 176, 190, 516 S.E.2d 225, 232 (1999) ("[I]t is the

public's perception of bias, not a litigant's personal perception, that a judge must consider when determining whether recusal is necessary to preserve the integrity of the judicial system.").

Accordingly, considering all of the circumstances of this case, we hold that Judge Griffith did not abuse his discretion by failing to recuse himself from this case. *Cf. Stockton v. Commonwealth*, 227 Va. 124, 141, 314 S.E.2d 371, 382 (1984) (holding that the trial judge did not err in refusing to recuse himself although he had presided over a previous trial in which the defendant cursed at him, noting that the judge expressly stated that he harbored "no animosity" towards the defendant for his previous remarks).

### C. *Sufficiency of the Evidence*

Third, Wilson contends that the evidence was insufficient to support his convictions. Specifically, Wilson argues that the evidence was insufficient to prove that he constructively possessed any of the cocaine or marijuana recovered from the apartment and the three vehicles.[10] We disagree.

▆▆▆ When the sufficiency of the evidence is challenged on appeal, the judgment of the trial court "is presumed correct and will be reversed only upon a showing that it is 'plainly wrong or without evidence to support it.' " *Viney v. Commonwealth*, 269 Va. 296, 299, 609 S.E.2d 26, 28 (2005) (quoting Code § 8.01–680). Also, "[t]he judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict," and, as such, "will not be set aside unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it." *Martin v. Commonwealth*, 4 Va.App. 438, 443, 358 S.E.2d 415, 418 (1987).

▆▆▆ "The Commonwealth may prove possession of a controlled substance by showing either actual or constructive

---

10. Wilson argued before the three-judge panel that the evidence was also insufficient to support the trial court's conclusion that he was a convicted felon. Wilson does not raise this argument on rehearing *en banc,* and, accordingly, we do not address it.

possession." *Barlow v. Commonwealth,* 26 Va.App. 421, 429, 494 S.E.2d 901, 904 (1998). To support a conviction based upon constructive possession, " 'the Commonwealth must point to evidence of acts, statements, or conduct of the accused or other facts or circumstances which tend to show that the defendant was aware of both the presence and character of the substance and that it was subject to his dominion and control.' " *Drew v. Commonwealth,* 230 Va. 471, 473, 338 S.E.2d 844, 845 (1986) (quoting *Powers v. Commonwealth,* 227 Va. 474, 476, 316 S.E.2d 739, 740 (1984)). However, "[t]he Commonwealth is not required to prove that there is no possibility that someone else may have planted, discarded, abandoned or placed the drugs...." *Brown v. Commonwealth,* 15 Va.App. 1, 10, 421 S.E.2d 877, 883 (1992) (*en banc*).

Here, the evidence was sufficient to show that Wilson "was aware of both the presence and character" of the marijuana found in the apartment and that the substance was "subject to his dominion and control." The marijuana, although not in plain view, was secreted in the kitchen cabinets of an apartment tailored to serve as the headquarters for a drug operation. Wilson was present in the kitchen of that apartment, with $1,755 cash in his pockets and a loaded weapon in his belt, at the time the apartment was searched. The trial court could reasonably have inferred that Wilson's presence in the apartment, coupled with the large amounts of cash and the gun in his possession, indicated that he was an active member of the drug operation and, as such, was both aware of the presence of the marijuana and capable of exercising dominion and control over that marijuana. *See, e.g., Archer v. Commonwealth,* 26 Va.App. 1, 12, 492 S.E.2d 826, 832 (1997) ("Although mere proximity to the contraband is insufficient to establish possession, it is a factor that may be considered in determining whether a defendant possessed the contraband.... [O]ccupancy of the premises on which the contraband was found is likewise a circumstance probative of possession."); *Hetmeyer v. Commonwealth,* 19 Va.App. 103, 111–12, 448 S.E.2d 894, 899–900 (1994) (noting that the defendant's possession of a large sum of money was a factor to be

considered in determining whether the defendant constructively possessed drugs found in his hotel room).

Moreover, we note that the Commonwealth was not required to prove that Wilson was the only person capable of exercising dominion and control over the marijuana. As we have held, a defendant's possession of an illegal substance " 'need not be exclusive.' " *Barlow*, 26 Va.App. at 429, 494 S.E.2d at 905 (quoting *Ritter v. Commonwealth*, 210 Va. 732, 741, 173 S.E.2d 799, 805–06 (1970)). Rather, " '[t]he defendant may share [the drugs] with one or more' " other individuals. *Id.* (quoting *Ritter*, 210 Va. at 741, 173 S.E.2d at 805–06); *see also Wells v. Commonwealth*, 32 Va.App. 775, 781, 531 S.E.2d 16, 19 (2000) ("Possession need not be actual, exclusive or lengthy in order to support a conviction; instead, the statute criminalizes constructive *or joint* possession . . . of any duration." (emphasis added)).

Similarly, the evidence was also sufficient to show that Wilson "was aware of both the presence and character" of the cocaine found in the apartment and that the cocaine was "subject to his dominion and control." As with the marijuana found in the kitchen, the trial court could reasonably have inferred that Wilson, as an active member of the drug operation, was both aware of the presence of the cocaine in the living room—which was in plain view—and capable of exercising dominion and control over that cocaine. As noted above, although all of the individuals located in the apartment may have also been aware of the ball of cocaine and capable of exercising dominion and control over that cocaine, the Commonwealth was not required to prove that Wilson alone had possession of the cocaine found in the living room.

As to the large quantities of cocaine found in the van, the evidence established that Wilson was the only member of the group who was carrying a key to that vehicle on the night the apartment was searched. Also, the ammunition magazine found in the van matched the gun Wilson was carrying, and none of the other individuals in the apartment were carrying that type of weapon. Because, as discussed above, the trial

court could reasonably have inferred that Wilson was a drug dealer actively involved in the operation headquartered at the apartment, the trial court could reasonably have inferred that Wilson was aware of the presence of cocaine in the van and that he exercised dominion and control over that substance.

We note that this case is readily distinguishable from *Clodfelter v. Commonwealth*, 218 Va. 619, 238 S.E.2d 820 (1977). In *Clodfelter*, the Virginia Supreme Court held that the defendant's possession of a key to a hotel room was insufficient to prove that he actually or constructively possessed the drugs found in that hotel room. *See id.* at 623, 238 S.E.2d at 822. In *Clodfelter*, the defendant's possession of the key was the sole circumstance upon which the finding of constructive possession was based. Here, in contrast, the trial court had numerous additional factors tending to prove that Wilson knew about the presence of the cocaine in the van and was capable of exercising dominion and control over that cocaine. Specifically, the evidence in this case was more than sufficient to establish that Wilson was—if not the leader—at least a member of the major, ongoing drug operation headquartered at the apartment. It follows that Wilson—as a member of that drug operation—would have been aware of the $350,000 worth of cocaine concealed in a vehicle to which he held the only key.

For similar reasons, we note that this case is distinguishable from *Huvar v. Commonwealth*, 212 Va. 667, 187 S.E.2d 177 (1972), and *Drew v. Commonwealth*, 230 Va. 471, 338 S.E.2d 844 (1986). In both *Huvar* and *Drew*, the Virginia Supreme Court held that the defendant's mere presence in the area where the drugs were found was insufficient to establish constructive possession. In *Huvar*, the defendant was arrested in the bathroom of an apartment. Drugs were scattered throughout the other rooms of the apartment, the apartment smelled of marijuana, and the defendant appeared to have been smoking marijuana. *See* 212 Va. at 668, 187 S.E.2d at 177–78. However, the Virginia Supreme Court reversed his conviction, reasoning that the defendant "made no statement, committed no act and indulged in no conduct from which the

inference could be fairly drawn that he possessed or controlled the drugs which the police found." *Id.* at 668, 187 S.E.2d at 178. Similarly, in *Drew,* the Virginia Supreme Court reversed the defendant's conviction for constructive possession of cocaine, reasoning that, "[a]t most, the evidence establishes that [the defendant] resided at . . . and . . . was near the residence the night the cocaine was seized. This is insufficient to prove constructive possession by the defendant." 230 Va. at 474, 338 S.E.2d at 846.

Here, however, the trial court did not base its findings of knowledge, dominion, and control solely on Wilson's presence in a place where drugs were found. Rather, the trial court based its findings on the fact that Wilson was found in an apartment outfitted to be the headquarters of a major drug operation, with a large amount of cash in his pocket, and a loaded weapon in his belt. Thus, unlike the circumstances presented in *Huvar* and *Drew,* the evidence in this case established more than the mere fact that Wilson was incidentally present in the location where the drugs were found; it established that Wilson was an active drug dealer present at the headquarters of a major drug operation of which he was a part. *Cf. Wells,* 32 Va.App. at 782, 531 S.E.2d at 19 (affirming conviction for constructive possession of marijuana where the evidence established that the defendant "was present for at least thirty minutes prior to the execution of a warrant," the police "found marijuana in numerous locations throughout the house" as well as "paraphernalia indicative of drug distribution, including two sets of scales and a large quantity of small Ziploc baggies," and the defendant had "a large quantity of cash on his person," reasoning that these factors "were sufficient to prove appellant possessed the marijuana jointly with others").

Considering all of the circumstances of this case, we hold that the evidence was sufficient to establish that Wilson was aware of the presence of the marijuana in the kitchen, the cocaine in the living room, and the cocaine in the van and that he exercised the requisite degree of dominion and control over those illegal substances. Thus, we affirm his convictions for

possession of cocaine with intent to distribute and possession of marijuana with intent to distribute.

## IV. CONCLUSION

For these reasons, we hold that the trial court did not abuse its discretion by refusing to halt the trial to permit the parties to finalize the last-minute plea negotiations. We also hold that, because Wilson failed to prove that he suffered actual bias or prejudice as a result of Judge Griffith's alleged judicial misconduct, Judge Griffith did not abuse his discretion by refusing to recuse himself from this case. Finally, we hold that the evidence was sufficient to support Wilson's convictions for possession of marijuana with intent to distribute and possession of cocaine with intent to distribute, and, therefore, we affirm his convictions.

*Affirmed.*

KELSEY, J., with whom BUMGARDNER and McCLANAHAN, JJ., join, concurring.

On the sufficiency issue, I join in the reasoning and result of the plurality opinion. On the plea agreement issue, I join only in the result reached by the plurality—preferring instead to decide the issue on narrower grounds.[11] I write separately on the recusal issue to underscore the legitimacy of the trial court's control over its docket and the illegitimacy of Wilson's claim that the trial judge's effort to do so in this case warrants his recusal.

### I. *The Unproffered Plea Agreement*

I see no need to decide whether Rule 3A:8(c)(2) serves as a *de facto* statute of frauds governing plea agreements. Nor is

---

**11.** "Faithful adherence to the doctrine of judicial restraint provides a fully adequate justification for deciding this case on the best and narrowest ground available." *Anzualda v. Commonwealth*, 44 Va.App. 764, 789–90, 607 S.E.2d 749, 762 (2005) (Kelsey, J., concurring) (quoting *Air Courier Conference v. Am. Postal Workers Union*, 498 U.S. 517, 531, 111 S.Ct. 913, 921–22, 112 L.Ed.2d 1125 (1991) (Stevens, J., concurring)); *see also Johnson v. Commonwealth*, 45 Va.App. 113, 117 n. 3, 609 S.E.2d 58, 60 n. 3 (2005).

it necessary to speculate about whether the trial judge made a factual finding that the putative plea bargain in this case was an unenforceable agreement to agree. Before either of those questions need be answered, we must first be given a proffer of the plea agreement that Wilson claims the trial judge refused to consider. That threshold *sine qua non* of appellate review has not been met here.[12]

When an appellant claims a trial judge erred by refusing something offered at trial, we can hardly begin the appellate task of reviewing the propriety of the trial judge's decision without first knowing exactly what it was he refused. *See generally Rose v. Jaques*, 268 Va. 137, 154, 597 S.E.2d 64, 74 (2004); *Holles v. Sunrise Terrace, Inc.*, 257 Va. 131, 135, 509 S.E.2d 494, 497 (1999). This prudential rule protects the judiciary from unknowingly engaging in purely hypothetical reasoning. For even if the trial judge erred, there may be any number of reasons why the error should be dismissed as harmless. Without having a proffer, we can reverse only by presuming no such reasons exist. Appellate courts, however, do not make presumptions in order to reverse a lower court judgment. We do just the opposite.

> The appellate courts of this Commonwealth "have many times pointed out that on appeal the judgment of the lower court is presumed to be correct and the burden is on the appellant to present to us a sufficient record from which we can determine whether the lower court has erred in the respect complained of. If the appellant fails to do this, the judgment will be affirmed."

*Crawley v. Ford*, 43 Va.App. 308, 315, 597 S.E.2d 264, 268 (2004) (quoting *Justis v. Young*, 202 Va. 631, 632, 119 S.E.2d 255, 256–57 (1961)).

---

12. The plurality opinion notes this point, albeit in passing. *Ante* at 12–13 (apparently holding that "the parties did not proffer any of the other necessary specifics of a proper plea agreement"); *see also Wilson v. Commonwealth*, 2005 WL 86467, No. 1229–03–1, slip op. at 27 (Va. App., Jan. 18, 2005) (Humphreys, J., concurring & dissenting) ("Moreover, the parties did not proffer any of the other necessary specifics of a proper plea agreement. . . .").

This case proves, as well as any, the virtue of the rule. Wilson was convicted of four crimes.[13] Two involved five-year mandatory minimum sentences that, by statute, could not be suspended and, by themselves, mandated a ten-year penitentiary sentence. Though Wilson claimed he made a plea bargain, he never once told the trial judge which charges he bargained for. All the trial judge knew was that, whatever the configuration of the charges, the net incarceration period would be only four years—less than half the mandatory, minimum sentences of just two of his four charges.

To find any *reversible* error in the trial judge's refusal to consider Wilson's putative plea agreement, we must necessarily presume Wilson would *not* have pled guilty to either of the two charges carrying five-year mandatory minimum sentences. Had he done so, Wilson's plea bargain would have violated the statutory minimum sentence as a matter of law. *See generally In re: Commonwealth of Virginia,* 229 Va. 159, 163, 326 S.E.2d 695, 697 (1985) ("Clearly, therefore, by prescribing a mandatory sentence, the General Assembly has divested trial judges of all discretion respecting punishment."). Under these circumstances, no trial judge would be reversed for refusing to consider such a facially flawed plea bargain—notwithstanding the reason, however erroneous, he may give for the refusal.

---

**13.** Wilson committed the offenses in December 2001. These four indictments alleged possession of cocaine with intent to distribute (Code § 18.2–248), possession of a firearm while in possession of drugs (Code § 18.2–308.4), possession of a firearm by a convicted felon (Code § 18.2–308.2), and possession of marijuana greater than one-half ounce and less than five pounds with intent to distribute (Code § 18.2–248.1). The felony firearm charge carried a five-year minimum, mandatory sentence because Wilson had previously been convicted of burglary, a violent felony. *See* Code §§ 18.2–308.2(A), 17.1–805(C). It could not be run concurrently with any other sentence. *Id.* The simultaneous possession of a firearm and PWID also carried a five-year mandatory minimum sentence. *See* Former Code § 18.2–308.4(B) (now subsection C). Wilson also faced a fifth charge alleging the simultaneous possession of a firearm and PWID which Judge Griffith dismissed. This charge also carried a five-year mandatory minimum sentence.

At no point did Wilson ever attempt to make a proffer (either orally or in writing) of the essential elements of the alleged agreement. Nor did Wilson say anything in the trial court to suggest how he would square his four-year sentence with the various charges he faced. To be sure, even when asked on appeal during *en banc* oral argument which charges, if any, would have been dismissed pursuant to the plea agreement, Wilson's counsel replied: "I assume some of them would, but I don't know.... I had an idea, but certainly it's not in the record."

In short, even if Judge Griffith erroneously refused to consider the putative plea agreement (either because it was not in writing, or was untimely, or whatever), there may very well have been perfectly valid reasons for reaching the same conclusion—rendering the claimed error harmless and any appellate reversal imprudent. We cannot presume no such reasons exist. By not proffering the alleged plea agreement, therefore, Wilson disabled us from passing judgment on the propriety of the trial judge's refusal to consider it.

## II. *Recusal of The Trial Judge*

Depending on the circumstances, a display of indignation by a trial judge may be the product of an impermissible bias against a litigant or a permissible zeal for protecting the judicial process from manipulation. The former may compel disqualification; the latter certainly does not. The appellate task of distinguishing between the two, no doubt, can be a subtle exercise in discerning a trial judge's motivations—a poorly discernible subject even when witnessed first person in a trial courtroom, but near inscrutable when evidenced on appeal only by a cold transcript. Given these limitations, we should be loath to impugn a trial judge with an allegation of bias unless the record clearly demonstrates it, a conclusion I cannot reach in this case.

After repeatedly requesting a bench trial, Wilson arrived on the day of trial in Judge Poston's courtroom. Before his case was called from the docket, however, Judge Poston had to leave the bench for a doctor's appointment. Judge Griffith

agreed to hear the remainder of Judge Poston's docket. After being escorted to Judge Griffith's courtroom, Wilson abruptly demanded a jury trial. Because no jury venire had been assembled, Wilson knew his request would necessitate a continuance. Judge Griffith nonetheless accepted Wilson's jury election and continued the trial to accommodate his request.

Later, Wilson appeared before Judge Martin to withdraw the jury election and to request the matter be rescheduled as a bench trial. Judge Martin reluctantly granted the motion and returned the case to the bench trial docket. After reading the transcript of the earlier hearing before Judge Griffith, however, Judge Martin expressed his concerns this way:

> I have no qualms about somebody who's previously asked for a jury trial coming in two or three days before trial and changing his mind and saying he wants a bench trial. Jurors aren't inconvenienced, *but when somebody is just judge shopping, then it does concern me when he later comes in and says now I don't want a jury and, in effect, I'd be awarding his judge shopping. That's what concerns me about it.*

(Emphasis added.) Judge Martin then acknowledged that, regrettably, "judge shopping is a time honored tradition, been going on for centuries"—to which Wilson's counsel unapologetically replied: "You do the best you can." It thus became obvious that Wilson earlier requested a jury trial not because he truly wanted a jury trial, but because he wanted a continuance for purposes of shopping for a different trial judge to preside over a bench trial.

Not unaware of this form of procedural gamesmanship, then-Chief Judge Jacobson, Judge Griffith, and Judge Martin later agreed that Wilson's bench trial should be reassigned to Judge Griffith. This decision placed Wilson in exactly the same position he was in before his short-lived jury election, hardly a fate he could justly complain about. Having been confronted with an impenitent abuse of the judicial process, the trial judges reacted prudently to disqualify the abuser

from his intended prize. "Judge shopping," after all, "is not a practice that should be encouraged." *In re Mann,* 229 F.3d 657, 658 (7th Cir.2000). Without question, "a court faced with judge-shopping has the authority to act to preserve the integrity and control of its docket." *Vaqueria Tres Monjitas v. Rivera Cubano,* 341 F.Supp.2d 69, 72 (D.P.R.2004).

Given these circumstances, I cannot in good conscience attribute ill will to Judge Griffith's participation in the collective decision to return Wilson's case to his bench trial docket. In the trial courts of this Commonwealth, a jury election should be used only by a defendant truly seeking a jury trial— not as a temporary expedience for delaying a bench trial for purposes of shopping for a different trial judge. If a prosecutor were to do such a thing, we would rightly expect our trial courts to rebuke the effort as a subterfuge. It is no less unacceptable for a criminal defendant to engage in this practice.

For these reasons, I join in the decision to affirm Wilson's convictions.

BENTON, J., dissenting. FITZPATRICK, CJ., and CLEMENTS, J., join in Parts I and II. ELDER, J., joins in Part II.

I believe that Rule 3A:8 requires a trial judge to at least consider any plea agreement prior to exercising the discretion to accept or refuse it. I also believe that the trial judge's refusal to consider the agreement was additional evidence of his animosity toward Tyrone Alphonso Wilson's attorney and that he abused his discretion in refusing to recuse himself. These errors, addressed in Parts I and II below, require a remand for a new trial. Further, I would reverse the convictions (except for the possession of a firearm by a convicted felon) because the evidence was insufficient to prove beyond a reasonable doubt that Wilson possessed cocaine or possessed marijuana.

## I.

The procedure governing plea agreements is set forth in Rule 3A:8(c). In pertinent part, the Rule provides:

(c) Plea Agreement Procedure.—

(1) The attorney for the Commonwealth and the attorney for the defendant or the defendant when acting pro se may engage in discussions with a view toward reaching an agreement that, upon entry by the defendant of a plea of guilty, or a plea of *nolo contendere,* to a charged offense, or to a lesser or related offense, the attorney for the Commonwealth will do any of the following:

(A) Move for *nolle prosequi* or dismissal of other charges;

(B) Make a recommendation, or agree not to oppose the defendant's request, for a particular sentence, with the understanding that such recommendation or request shall not be binding on the court;

(C) Agree that a specific sentence is the appropriate disposition of the case.

In any such discussions under this Rule, the court shall not participate.

(2) *If a plea agreement has been reached by the parties, it shall, in every felony case, be reduced to writing,* signed by the attorney for the Commonwealth, the defendant, and, in every case, his attorney, if any, *and presented to the court.* The court shall require the disclosure of the agreement in open court or, upon a showing of good cause, in camera, at the time the plea is offered. If the agreement is of the type specified in subdivision (c)(1)(A) or (C), the court may accept or reject the agreement, or may defer its decision as to the acceptance or rejection until there has been an opportunity to consider a presentence report. If the agreement is of the type specified in subdivision (c)(1)(B), the court shall advise the defendant that, if the court does not accept the recommendation or request, the defendant nevertheless has no right to withdraw his plea, unless the Commonwealth fails

to perform its part of the agreement. In that event, the defendant shall have the right to withdraw his plea.

 \* \* \* \* \* \*

(4) If the agreement is of the type specified in subdivision (c)(1)(A) or (C) and *if the court rejects the plea agreement,* the court shall inform the parties of this fact, and advise the defendant personally in open court or, on a showing of good cause, in camera, that the court will not accept the plea agreement. Thereupon, neither party shall be bound by the plea agreement. The defendant shall have the right to withdraw his plea of guilty or plea of *nolo contendere* and the court shall advise the defendant that, if he does not withdraw his plea, the disposition of the case may be less favorable to him than that contemplated by the plea agreement; *and the court shall further advise the defendant that, if he chooses to withdraw his plea of guilty or of nolo contendere, his case will be heard by another judge, unless the parties agree otherwise.*

(Emphasis added.)

The trial judge abused his discretion when he refused to consider the plea agreement the Commonwealth's attorney and Wilson's attorney were prepared to offer. The attorneys informed the judge they had reached an agreement, specifying that "Wilson would like to enter a plea of guilty" and that the agreement "call[ed] for a total sentence of twenty years with four to serve." The Commonwealth's attorney "ask[ed] the court to accept the plea" but acknowledged they did not "have a plea agreement written out." When the judge refused to accept the plea agreement, the prosecutor sought to explain that "these last minute plea negotiations" had occurred because of information she received "yesterday." She indicated "[i]t's on the Commonwealth this time, judge." At her request, the judge agreed to hear her representations in chambers.

The prosecutor informed the trial judge in chambers that an investigation had been launched concerning an allegation of "inaccurate testimony" by a police investigator, who was also

involved in Wilson's case. She also informed the judge that the prosecutor "had offered Mr. Wilson . . . five years back in July and today again dealing with uncertainties as to what would happen, I offered him four." She further explained that the agreement had not been reduced to writing because she "was instructed [by her supervisor] . . . what [she] had to do . . . last night."

In the courtroom, the trial judge announced that "[t]here is no agreement," that he would not consider any plea agreement, that it was "too late to negotiate," and that he was "not going to interrupt this trial and [allow the parties to] submit a plea agreement." The record establishes, however, that at this point no witnesses had been sworn and the attorneys had not even made opening statements.

Although Rule 3A:8(c) indicates a plea agreement "shall, in every felony case, be reduced to writing," we have held that a defendant's "substantial rights were not implicated by the fact that the plea agreement was not in writing or disclosed in open court." *Hairston v. Commonwealth*, 16 Va.App. 941, 945, 434 S.E.2d 350, 352–53 (1993). "The purpose of Rule 3A:8(c)(2), a procedural rule, is to ensure that plea agreements are fully disclosed to both the trial court and the defendant." *Id.* at 945, 434 S.E.2d at 353. Moreover, to hold that the parties had failed to present a proper plea agreement because it was not reduced to writing is contrary to the plain language of Rule 3A:8. The fact that a plea agreement had not yet been reduced to writing did not prevent the parties from having reached an understanding as to the terms and conditions of an agreement, which the Commonwealth's attorney indicated they had done. Rule 3A:8(c)(2) expressly provides that a plea agreement exists when the parties have reached an agreement as to whether the Commonwealth's attorney will make a sentence recommendation, or specific sentence, or move for a *nolle prosequi* or dismissal of other charges as provided in subsection (c)(1)(A), (B), or (C) and thereafter "it shall . . . be reduced to writing. . . ." Thus, under the Rule a plea agreement exists when the parties have reached an agreement the

terms of which comport with either subsection (A), (B), or (C) of Rule 3A:8(c).

In other words, the agreement exists prior to the writing. Indeed, to deny that an oral agreement could exist is contrary to our decision in *Hairston*, where we enforced the terms of an oral plea agreement *against* a defendant. 16 Va.App. at 945, 434 S.E.2d at 352–53. The plurality's pinched reading of Rule 3A:8 ignores the purposes of the rule, which are to provide public disclosure of plea agreements and to avoid arguments over the terms in the event either the Commonwealth or the defendant is in breach. In this case, the record shows that the terms of the plea agreement had been reached and were orally presented to the trial judge. The Commonwealth's attorney said, "Before this case proceeds further, it's my understanding that Mr. Wilson would like to enter a plea of guilty. We don't have a plea agreement written out. We would ask for the court to accept the plea." The Commonwealth's attorney also said the agreement "called for a total of twenty years with four to serve." Clearly, the parties had reached a meeting of the minds and needed only the opportunity to reduce the plea terms to writing. Indeed, the trial judge did not refuse to hear the agreement because there was "no meeting of the minds," but because he wanted to begin the trial. He ruled, "You seem to think ... that somehow or another you have a right to stop everything and present a plea agreement and force me to consider a plea agreement. This trial is ready to begin." In view of these circumstances, I would hold that the judge erroneously refused to consider the plea agreement.

I would also hold that the trial judge erroneously concluded that the trial had already begun, that the prosecutor and Wilson's attorney were barred from presenting an agreement, and that Wilson was barred from entering a guilty plea consistent with the agreement. We are not bound by findings that are plainly wrong. *Hudson v. Hudson*, 249 Va. 335, 342, 455 S.E.2d 14, 18 (1995). The record belies the trial judge's ruling that the trial had begun. No witnesses had been sworn when these discussions occurred. In addition, even assuming

the mere formal opening of the court could be deemed the commencement of trial and acknowledging that a plea of guilty is separate and distinct from a plea agreement, we have previously held that "[t]he fact . . . the trial has begun has no effect on a defendant's constitutional right to plead guilty." *Graham v. Commonwealth,* 11 Va.App. 133, 141, 397 S.E.2d 270, 274 (1990). The judge's error is plain.

The Commonwealth's concern, expressed on appeal for the first time, that presenting a plea agreement after a trial has begun might constitute a defendant's attempt to force a judge to be removed from a case, is misplaced. The judge need entertain only agreements that have been "reached by the parties." Rule 3A:8(c)(2). Therefore, a defendant in a criminal trial is unable to unilaterally force the judge to consider a plea agreement or to require a judge to remove him or herself from the case in the event that the judge rejected the agreement. Only if the defendant and the Commonwealth, as in this case, have reached an agreement, must the trial judge consider it. *See* Rule 3A:8. The spirit of the rule intends for a trial judge, at the very least, to consider the plea. Only when he had done so should he be able to exercise his discretion in refusing or accepting it on its terms.

I would hold that the trial judge erred by refusing to consider the proffered agreement, or any agreement predicated upon a guilty plea that the parties had reached. Rule 3A:8 requires a trial judge to consider a plea agreement reached by the Commonwealth's Attorney and a defendant. The trial judge was not privileged to refuse to consider the agreement reached between the parties or to treat the agreement as though none existed.

## II.

I would also hold that the trial judge should have granted Wilson's motion that the judge recuse himself from presiding over the trial.

On July 16, 2002, when this case was set for trial, the clerk called the case and asked Wilson whether he wanted a trial by

jury or a bench trial. Wilson said he wanted a jury trial. The trial judge noted that a jury could not be secured that day, said he would arraign Wilson, and ruled the trial would begin the following day. As the clerk began the arraignment, the trial judge interrupted and said Wilson's attorney had "caused this problem." He then announced that he was "going to relieve [Wilson's attorney] . . . from [his] responsibilities in this case." When he learned that Wilson's attorney was privately retained and not court appointed, he ruled: "I am removing you from the court appointed list, effectively immediately. . . . I am not going to have a court-appointed lawyer who practices that way in this court building." He then continued the case noting that "the defendant's constitutional right to a jury trial overrides any shenanigans that the attorney may participate in." In denying Wilson's later motion that he recuse himself from the trial, the judge said that he did not "hold any ill will toward [Wilson's attorney]" and that he was "going to be fair."

"A judge shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Canon 3(C) of the Canons of Judicial Conduct for the State of Virginia. "The requirement of this Canon is clear; a judge must diligently avoid not only impropriety but a reasonable appearance of impropriety as well." *Davis v. Commonwealth,* 21 Va.App. 587, 591, 466 S.E.2d 741, 743 (1996). *See also,* Canon 3(E) ("A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. . . ."). As the Commentary to Canon 3(B)(5) explains, a judge who "manifests bias on any basis in a proceeding impairs the fairness of the proceeding and brings the judiciary into disrepute. . . . A judge must be alert to avoid behavior that may be perceived as prejudicial."

The Supreme Court has held that recusal was not required when a party alleged the trial judge committed only a "purported" violation of the Canons, that is, conduct that is suspected or falsely assumed to be a violation but is in fact not. *Commonwealth v. Jackson,* 267 Va. 226, 229, 590 S.E.2d 518, 519 (2004). In that case, a probation revocation proceeding,

the defendant "requested Judge Griffith to recuse himself because he was the elected Commonwealth's Attorney . . . at the time [the defendant] was convicted of the offense resulting in the suspended sentence." *Id.* at 228, 590 S.E.2d at 519. The defendant alleged a violation of Canon 3(E)(1)(b), which requires a judge to disqualify himself if "[t]he judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter." Citing its holding in *Green v. Commonwealth*, 263 Va. 191, 195–96, 557 S.E.2d 230, 233 (2002), the Court explained that the trial judge committed no violation of this Canon because a probation revocation hearing, while a criminal proceeding, is not a stage of a criminal prosecution. *Jackson*, 267 Va. at 229, 590 S.E.2d at 519. Therefore, the Court rejected the suggestion that the trial judge was both the accuser at the original criminal trial and the trier-of-fact at a continuation of the same trial. *Id.* In addition, the Court noted that it has "not required a judge to recuse [himself] . . . merely because he . . . has seen or had indirect knowledge of the defendant on a previous occasion." *Id.*

The Court, however, has "consistently held that a trial judge must exercise reasonable discretion to determine whether he possesses such bias or prejudice as would deny a party a fair trial." *Deahl v. Winchester Dep't of Social Services*, 224 Va. 664, 672, 299 S.E.2d 863, 867 (1983). "In exercising his discretion in this regard, the judge must be guided not only by the true state of his impartiality, but also by the public perception of his fairness, in order that public confidence in the integrity of the judiciary may be maintained." *Stamper v. Commonwealth*, 228 Va. 707, 324 S.E.2d 682, 686 (1985). In other words, "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 14, 99 L.Ed. 11 (1954).

I would hold the trial judge's actions would convey to a reasonable person a belief he would not receive a fair trial because the judge was not impartial. The judge ruled in the presence of Wilson that the attorney had used "shenanigans"

when advising Wilson of his constitutional right to seek a jury trial. The attorney's advice to Wilson must be viewed, however, within the context of this circuit court's procedures. As the trial judge noted on the record, the circuit court's scheduling practices are such that attorneys make these "last-minute" requests for jury trials. Specifically, he acknowledged that, "with that policy in mind, you run the risk every time you walk over here of messing with our scheduling practices by making a last-minute request for a jury." However, as we held in *Jones v. Commonwealth*, 24 Va.App. 636, 484 S.E.2d 618 (1997), a case that arose from this same circuit court, a trial judge may not rely upon a scheduling order for determining waiver of a jury trial when the record does not show that the defendant had manifested by some deliberate action an election to forego his right to a jury trial. *Id.* at 640–41, 484 S.E.2d at 620–21. *See also Robinson v. Commonwealth*, 36 Va.App. 1, 548 S.E.2d 227 (2001); *Herbert v. Commonwealth*, 33 Va.App. 506, 534 S.E.2d 369 (2000). As punishment for the attorney's advice to Wilson to invoke his right to a jury trial under the court's procedures, the trial judge sought to remove the attorney from his representation of Wilson and, when that could not be achieved, removed the attorney from the list of eligible court-appointed attorneys. "To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.' " *United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982) (citation omitted). To assure that he would try Wilson after punishing Wilson's attorney, the judge later made an affirmative, successful effort to solicit the re-assignment of this case to his courtroom for trial.

As previously discussed, the trial judge later refused to accept a plea agreement as requested by Wilson and the Commonwealth. The record further establishes that the sentence imposed on Wilson exceeded the sentencing guidelines and exceeded the sentences imposed upon the lessee of the apartment (where the marijuana was hidden) and the owner of the van (where the cocaine was hidden), both of whom were arrested in the residence. Although Wilson represents on

brief that his sentence exceeded those of each of the other four defendants, the sentences of two defendants are not disclosed on the record.

When the state undertakes to deprive a person of liberty, then the trial must not only be fair, it must appear to be fair before the public. Both fairness and the integrity of our judicial process were called into question by the trial judge's actions. I would hold, therefore, that these circumstances establish that the trial judge abused his discretion in denying Wilson's motion that the judge recuse himself from the trial.

### III.

In addition, the evidence did not prove that Wilson actually possessed any of the marijuana or cocaine.

> To support a conviction based upon constructive possession, "the Commonwealth must point to evidence of acts, statements, or conduct of the accused or other facts or circumstances which tend to show that the defendant was aware of both the presence and character of the substance and that it was subject to his dominion and control." . . . Mere proximity to a controlled drug is not sufficient to establish dominion and control.

*Drew v. Commonwealth,* 230 Va. 471, 473, 338 S.E.2d 844, 845 (1986) (citation omitted). "[W]here, as here, a conviction is based on circumstantial evidence, 'all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence.'" *Garland v. Commonwealth,* 225 Va. 182, 184, 300 S.E.2d 783, 784 (1983) (citation omitted). Proof of suspicious circumstances, "no matter how strong, is insufficient to sustain a criminal conviction." *Stover v. Commonwealth,* 222 Va. 618, 624, 283 S.E.2d 194, 197 (1981) (citing *Thomas v. Commonwealth,* 187 Va. 265, 271–72, 46 S.E.2d 388, 391 (1948)).

I agree that Wilson was found in suspicious circumstances. He was seized in an apartment that contained marijuana and cocaine. Wilson had a large amount of cash and a weapon. Wilson had in his possession the key to a van that concealed

$350,000 worth of cocaine and that contained a Ruger .45–caliber magazine, which fit the weapon Wilson had in his possession. While these suspicious circumstances were not trifles, the Commonwealth failed to prove, beyond mere suspicions, that Wilson was aware of the cocaine in the van (a vehicle that he did not own or occupy), that he was aware of the marijuana located in a closed kitchen cabinet (in an apartment he did not own or lease), and that he exercised the kind of dominion or control, commensurate with possession, over any of the marijuana or cocaine.

To sustain convictions for constructive possession, the Supreme Court and this Court have required much more compelling evidence than the circumstance here. "The evidence must go further than create a mere suspicion or probability of guilt. There must be credible evidence to arrive at a conclusion of guilt beyond a reasonable doubt." *Rich v. Commonwealth,* 198 Va. 445, 452, 94 S.E.2d 549, 554 (1956). Thus, for constructive possession, the evidence must be sufficient to prove beyond a reasonable doubt that the defendant was both aware of the presence and character of the substance and that he exercised dominion and control over the substance commensurate with actual possession. *See e.g., Drew,* 230 Va. at 474, 338 S.E.2d at 846 (holding that the evidence was insufficient to prove constructive possession by the defendant where it established, at most, that he resided at the residence and was near the residence the night the cocaine was seized from it); *Powers v. Commonwealth,* 227 Va. 474, 476, 316 S.E.2d 739, 740 (1984) (proving that drugs were found secreted in the defendant's house was insufficient to prove he constructively possessed the drugs); *McNair v. Commonwealth,* 31 Va.App. 76, 86, 521 S.E.2d 303, 308 (1999) (holding that " '[s]uspicious circumstances, including proximity to a controlled drug, are insufficient to support a conviction [for constructive possession]' "); *Nelson v. Commonwealth,* 17 Va.App. 708, 711, 440 S.E.2d 627, 628 (1994) (arresting the defendant in a motel room registered to another was insufficient to prove he knew that cocaine was on the premises or that he exercised any control over the cocaine, where "[c]ocaine was secreted in a

toothbrush holder in the [motel] bathroom, and a small amount was found on the carpet under the bed"); *Burchette v. Commonwealth,* 15 Va.App. 432, 435, 425 S.E.2d 81, 83 (1992) (holding that ownership or occupancy of a vehicle where drugs were located was insufficient to establish constructive possession); *Behrens v. Commonwealth,* 3 Va.App. 131, 135, 348 S.E.2d 430, 432 (1986) (holding that evidence was suspicious, but insufficient to establish constructive possession, when drugs were found in a hotel room registered to defendant and defendant was not seen in proximity to drugs).

This concern for a conviction based on suspicion is reflected in the statutory admonition that neither proximity to, nor a proprietary interest in, the premises containing the illegal substance is sufficient to convict. Proof of "ownership or occupancy of premises or vehicle upon or in which a controlled substance was found shall not create a presumption that such person either knowingly or intentionally possessed such controlled substance." Code § 18.2–250. Notably, Wilson was neither the owner nor occupant of the van nor was he in the proximity of the van during the seizure. Wilson was in the apartment, and the van was parked some distance away. The trial judge erred in concluding that Wilson constructively possessed the drugs in the van.

Prior cases demonstrate that the circumstances here do not establish Wilson's guilt beyond a reasonable doubt. For example, in *Burchette,* the defendant owned the vehicle where police found his wallet, cell phone, pager, and bills in his name, in addition to marijuana packaged for distribution. Unlike in this case, where the cocaine was elaborately hidden in the vehicle, some of the marijuana discovered in Burchette's vehicle was in plain view. 15 Va.App. at 435, 425 S.E.2d at 83. The police also observed Burchette walking by the vehicle, which was parked in front of his home, shortly before he drove away in another vehicle. *Id.* We held that the evidence amounted to mere suspicion only and, because the Commonwealth failed to negate the reasonable inference that someone other than Burchette had used the car and placed the marijua-

na there, the evidence failed to support the conviction. *Id.* at 439, 425 S.E.2d at 86.

Wilson's possession of the key to the van, coupled with the officer's discovery of the .45–caliber magazine in the van, does not establish Wilson's awareness of the cocaine concealed in hidden compartments. Wilson did not own the van. Indeed, no evidence proved he had been inside the van. The Supreme Court also has held that possession of a key to a location where drugs are located is not sufficient to establish either awareness or dominion and control. *See Clodfelter v. Commonwealth,* 218 Va. 619, 238 S.E.2d 820 (1977). This is true even when the defendant was the sole occupant of the place at issue. *Id.* at 621, 238 S.E.2d at 821. In *Clodfelter,* the defendant, like Wilson, had the key to the place where drugs were located (in Clodfelter's case, a hotel room). *Id.* Unlike Wilson, who had the key but was not the owner, Clodfelter was the only registered guest in that hotel room and was, thus, both owner and occupant. Despite this more compelling evidence, the Supreme Court reversed his conviction, holding that "while the evidence created a strong suspicion of guilt, it fell short of proving possession beyond a reasonable doubt." *Id.* at 623, 238 S.E.2d at 822. The Court made the following pertinent observations about the suspicious circumstances:

> Distilled to its basic elements, the evidence, and reasonable inferences therefrom, show that Clodfelter rented the hotel room and that he had deposited some of his personal effects there. The evidence also shows that Clodfelter, when questioned by the police, gave a false identity. Certainly this evidence creates a strong suspicion of guilt, but it falls short of showing beyond a reasonable doubt that the drugs found in the hotel room were ever actually or constructively possessed by Clodfelter with an awareness of their character.

*Id.* at 624, 238 S.E.2d at 822. As *Burchette* and *Clodfelter* demonstrate, Wilson's possession of the key to the van, and the presence of the magazine inside the van, do not establish beyond a reasonable doubt that Wilson was aware of the

cocaine or that he exercised any measure of dominion and control over the hidden cocaine.

In addition to this failure of proof, the Commonwealth also failed to disprove reasonable hypotheses that flowed from the evidence that were "inconsistent with guilt." Despite extensive surveillance, the police did not testify about when or how Wilson arrived at the apartment, whether he drove the van, or for what purpose he was at the apartment. Because the cocaine was elaborately concealed in a hidden compartment, where it was discovered only after a drug sniffing dog alerted and an extensive search occurred, the evidence left entirely within the realm of reasonable possibility that the owner of the van, Javone McCantz, who was also seized during the raid at the apartment, alone possessed the cocaine and alone knew of its existence. The evidence does not negate the reasonable hypothesis that Wilson had the key for a purpose unrelated to the cocaine. No evidence even negated the inference that, if Wilson had driven the van, he had done so without being aware of the hidden cocaine. Indeed, no evidence proved Wilson had been in the van. As in *Clodfelter* and *Burchette*, the discovery of the .45–caliber Ruger magazine at most suggests that Wilson *may* have been in the van at some point in the past. We do not know when, because the Commonwealth's evidence failed to prove this critical fact.

The evidence was similarly lacking that Wilson was aware of the presence of the marijuana in the kitchen cabinet or that he exercised any measure of dominion and control over it. Police seized the marijuana from a closed kitchen cabinet. The only fact the Commonwealth identifies as suggesting that Wilson was aware of the marijuana was his mere presence in the apartment. The trial judge could not properly assume from this fact that Wilson knew of the presence of the marijuana. As the Supreme Court held in *Huvar v. Commonwealth*, 212 Va. 667, 187 S.E.2d 177 (1972), it is impermissible for a fact finder to infer awareness and control of drugs simply because a suspect is present at a location where drugs were found. In *Huvar*, the defendant was arrested in the bathroom of an apartment; drugs were scattered in plain view in other rooms;

the apartment smelled of marijuana; and the defendant appeared to have been using drugs. 212 Va. at 668, 187 S.E.2d at 177–78. Despite the "suspicious circumstances," the Court held that the defendant did not have constructive possession of the drugs.

It is the theory of the Commonwealth that the police interrupted a "pot party." One could reasonably reach this conclusion from the evidence. However, the mere presence of defendant at the party is not sufficient to convict him of actual or constructive possession of the drugs that were found there. It was not his apartment. Those present were not shown to have been his guests or there at his invitation. None of the prescription containers in which some of the drugs were found bore his name on their labels. He made no statement, committed no act and indulged in no conduct from which the inference could be fairly drawn that he possessed or controlled the drugs which the police found.

*Id.* at 668, 187 S.E.2d at 178.

Similarly, in *Drew*, the Supreme Court reversed a conviction for constructive possession where a search of a residence revealed the defendant's checkbook, bank statement, telephone bill, driver's license, vehicle registration, credit union voucher, and a large amount of cocaine and drug paraphernalia. Each documentary item listed the residence as the defendant's address. In addition, the evidence proved the police saw the defendant standing near the residence. 230 Va. at 472, 338 S.E.2d at 845. Despite these suspicious circumstances, the Supreme Court held the evidence was insufficient to establish constructive possession: "At most, the evidence establishes that [the defendant] resided at ... and ... was near the residence the night the cocaine was seized. This is insufficient to prove constructive possession by the defendant." *Id.* at 474, 338 S.E.2d at 846.

In comparison to both *Huvar* and *Drew*, the evidence against Wilson was weaker still. He was not the lessee or the owner. The lessee was actually present in the apartment with Wilson and other people. The marijuana was not in plain

view; it was hidden in the kitchen cabinet. The evidence failed to establish any connection, beyond speculation, between Wilson's money and the marijuana. The Commonwealth simply failed to prove beyond a reasonable doubt that Wilson was aware of the presence of marijuana. Suspicious circumstances are never enough to establish guilt. *Christian v. Commonwealth,* 221 Va. 1078, 1082, 277 S.E.2d 205, 208 (1981).

Similarly, Wilson was not in proximity to the hardball of cocaine when the police entered the apartment. He was in the kitchen, while the hardball of cocaine, which did not have his fingerprints on it, was in the living room. The presence of this one item of cocaine, in plain view but in a room where Wilson was not, certainly cannot provide the basis for the fact finder to conclude Wilson was aware of the presence and character of this single hardball of cocaine. *See Huvar,* 212 Va. at 668, 187 S.E.2d at 177–78 (holding that a defendant's presence in an apartment where the odor of marijuana was prevalent and drugs were scattered about is insufficient to prove he possessed or controlled the drugs).

The essence of constructive possession for drugs is control, which must be proven beyond a reasonable doubt. If the Supreme Court and this Court could not conclude that the defendants in *Burchette, Huvar, Behrens,* and other cases constructively possessed drugs, we cannot sustain Wilson's conviction on weaker evidence. Our case law has been clear on the law of constructive possession and has guarded against "ad hoc judicial judgments against those often identified by chance discovery, and prosecuted by official whimsy." Charles H. Whitebread and Ronald Stevens, *Constructive Possession in Narcotics Cases: To Have and Have Not,* 58 Va. L.Rev. 751, 751 (May 1972). This record contains no "evidence of acts, statements, or conduct of the accused or other facts or circumstances which tend to show that the defendant was aware of both the presence and character of the substance and that it was subject to his dominion and control." *Powers,* 227 Va. at 476, 316 S.E.2d at 740. In short, the evidence in this case is consistent with Wilson's presence

at the apartment as a visitor; it failed to prove he possessed any of the drugs.

For these reasons, I would hold that the evidence was insufficient to support the three drug related convictions. Thus, I would reverse the convictions and dismiss all indictments except possession of a firearm by a felon.

FRANK, J., concurring, in part, and with whom ELDER, J., joins, dissenting, in part.

I concur with the majority opinion that the evidence is sufficient to convict appellant. However, I believe the trial court erred in not recusing himself and I would reverse the convictions on that basis. Since I would reverse on the recusal issue, there is no need to address whether the trial court erred in the plea agreement ruling.

I concur with Judge Benton's dissent, but we must further address *Commonwealth v. Jackson*, 267 Va. 226, 590 S.E.2d 518 (2004). I believe *Jackson* is clearly distinguishable on its facts. The trial judge that presided over Jackson's revocation hearing was the elected Commonwealth's Attorney at the time Jackson was convicted of the underlying offense that gave rise to the revocation proceedings. This was the sole basis for the motion for recusal. The Supreme Court held:

> Jackson's argument would result in *per se* disqualification of any judge who had served as Commonwealth's Attorney in any matter involving individuals who had committed a crime or been prosecuted at the time that the judge was Commonwealth's Attorney without any indication of the judge's actual prior involvement in the case or other evidence of bias or prejudice. We have rejected, and continue to reject, such a per se rule. *See Justus v. Commonwealth*, 222 Va. 667, 673, 283 S.E.2d 905, 908 (1981).

267 Va. at 229, 590 S.E.2d at 519.

There are no facts suggesting the trial court treated Jackson in a biased or prejudicial manner at the revocation hearing. The Supreme Court concluded, "[i]n the absence of proof of actual bias, recusal is properly within the discretion of the

trial judge." *Id.* at 229, 590 S.E.2d at 520 (referencing *Motley v. Virginia State Bar,* 260 Va. 251, 262, 536 S.E.2d 101, 106 (2000)).

*Jackson* simply rejected a *per se* disqualification. It did not end appellate inquiry as to whether a trial court abused its discretion in not recusing itself.

Here, appellant proved actual bias and prejudice against him. As Judge Benton discussed in his dissent, the trial judge severely admonished appellant's attorney for asking for a jury at the last moment. He barred counsel from receiving court appointments. When the judge learned that another judge was assigned the case, he actively solicited that the case be returned to his court. Then, at trial, when both the Commonwealth's attorney and appellant's counsel indicated they had reached a plea agreement, albeit not in writing, the judge refused to allow counsel to complete the agreement. At sentencing, the judge far exceeded the guidelines in sentencing appellant.

While each of these acts by the judge was not individually an abuse of discretion, the combined effect of these actions inescapably indicates an animus toward appellant and his counsel.

The trial judge indicated he harbored no prejudice against appellant, but his actions spoke otherwise. *Jackson* cannot be read to say that despite a clear indication of bias, the trial judge does not abuse his discretion in not recusing himself if he merely intones the magic words of fairness.

I agree with Judge Benton that appellant met his burden under *Jackson.*